IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2018

**IN RE CHASE L.**

**Appeal from the Juvenile Court for Davidson County
No. 2015-1282, 203347, 218898      Sheila Calloway, Judge**

_____

**No. M2017-02362-COA-R3-PT**

_____

In this termination of parental rights case, the trial court terminated Mother's rights on the grounds of (1) abandonment by willful failure to visit; (2) abandonment by wanton disregard; (3) substantial noncompliance with the permanency plans; (4) abandonment by failure to provide a suitable home; and (5) persistent conditions.  In its brief, DCS conceded that it cannot defend the grounds of failure to establish a suitable home and persistent conditions.  As such, we reverse as to the grounds of abandonment by failure to provide a suitable home and persistent conditions.  The trial court's judgment is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in
Part; Affirmed in Part; and Remanded**

J. STEVEN STAFFORD, P.J.,W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S.,  and JOHN W. MCCLARTY, J., joined.

David R. Grimmett, Nashville, Tennessee, for the appellant, T.L.

Herbert H. Slatery, III, Attorney General and Reporter;  Kathryn A. Baker, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

FACTS

Chase L. ("the child") was born in early December 2014 to T. L. ("Mother").[1]  No father was listed on the child's birth certificate; however, Mother and C. M. ("Father")

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the

acknowledge that he is the child's biological father.[2] Mother and Father have had a ten-year on-and-off relationship. Mother has a history of drug abuse and domestic violence throughout her relationship with Father, and in 2010 Mother was diagnosed with Posttraumatic Stress Disorder as a result of this domestic violence. Despite this fact, Mother continued her relationship with Father, who is the biological parent of three of Mother's seven children.

In late December 2014, the Department of Children's Services ("DCS" or "the Department") received a referral regarding Mother and the child involving allegations of lack of supervision, drug-exposed child, and physical abuse.[3] DCS began an investigation as a result of the referral. In January 2015, DCS conducted an unannounced home visit to Mother and Father's residence at which time DCS requested that Mother take a drug screen. Mother refused to do so at the time, although she denied using any drugs. Mother then agreed that she would attend the next session of family treatment court. Mother attended at least one family treatment court session subsequent to the DCS home visit, but eventually stopped attending the sessions claiming it was too difficult to travel to the court house where the sessions were held.

On April 6, 2015, DCS received another referral alleging domestic violence between Mother and Father that occurred on or about March 28, 2015. Mother later admitted that she maintained a relationship with Father until this incident. When the incident occurred, the child was present in the home. Mother admitted that Father hit her and that she retaliated by stabbing Father with a butcher's knife in the arm. As a result of the incident, Father was arrested at the end of March, and Mother was arrested on April 13, 2015. Mother ultimately pleaded guilty to aggravated assault on May 14, 2015, and was sentenced to three years' incarceration; however, the incarceration was suspended and Mother was placed on supervised probation.

After Mother and Father were arrested, the child was placed with Mother's cousin in a non-custodial safety placement. Mother agreed to this placement. On June 1, 2015, Mother's cousin could no longer care for the child and he began to live with Lisa R. ("Foster Mother") and Greg R. ("Foster Father," and together with Foster Mother, "Foster Family"), church friends of Mother's cousin. The child was placed in DCS's custody shortly after, in August 2015, because Foster Family could no longer financially support the child. On August 14, 2015, the Davidson County Juvenile Court ("trial court") entered an order adjudicating the child as dependent and neglected due to domestic violence concerns. The child continued to reside with Foster Family following

---

names of minor children and other parties in order to protect their identities.

[2] Father's parental rights were previously terminated, and he is not a party to this appeal.

[3] Prior to this referral, Mother had a long history with DCS regarding her other children. Mother's parental rights have been terminated to three of her older children prior to this appeal.

the adjudication. The trial court granted Mother a minimum of four (4) hours of supervised visitation per month.

At this time, DCS provided Mother with in-home visitation and family violence intervention services. Foster Family also provided Mother with visitation during this time. These services were provided to Mother until November 2015, at which time DCS was relieved of reasonable efforts by the trial court. Mother, however, claims she was not concerned because she was receiving visits at the Foster Family's discretion. These visitations, however, ceased in December 2015, when Foster Family began refusing her requests for visits because they were instructed to direct Mother to DCS to set up visitation. There is no dispute that Mother often called Foster Family to check in with the child and ask for visitation.

A permanency plan was created on August 27, 2015. The plan was ratified by the trial court on September 29, 2015. At the ratification hearing, the trial court found that the permanency plan's requirements were reasonably related to the plan's goal and that DCS was relieved from providing Mother with reasonable efforts pursuant to Tennessee Code Annotated section 37-1-166(g) due to the termination of Mother's parental rights to three of the child's siblings. Although Mother did not attend this ratification hearing, Mother's attorney was present. Pursuant to the plan, Mother was to: (1) continue with mental health services and follow all recommendations; (2) remain compliant with all medications; (3) complete an Alcohol and Drug assessment and participate in random drug screens; (4) complete a functional parent assessment with a mental health component and follow all recommendations; (5) maintain consistency on scheduled visits; (6) remain compliant with therapeutic visitation; (7) cooperate with DCS and service providers; (8) obtain and maintain a legal source of income and housing; (9) attend and complete all future criminal proceedings; (10) complete all orders and restrictions entered by criminal court; and (11) avoid further criminal activity.

The permanency plan was amended in July 2016, with the ratification hearing taking place over two days in late July and early August. The DCS Family Services Worker later testified that she mailed the permanency plan and the adjudicatory order to Mother's address and explained Mother's responsibilities in the plan to her over the phone. In addition to the requirements under the initial plan, Mother was required to refrain from engaging in domestic violence for a period of one year.

On May 3, 2016, DCS filed a petition to terminate Mother's rights on three grounds: (1) abandonment by failure to visit or support; (2) abandonment by failure to establish a suitable home; and (3) substantial non-compliance with the permanency plans.

In August 2016, Father came to Mother's home to ask for money, despite the fact that Mother stated that their relationship was over after the March 2015 incident. After Father left Mother's home, Mother's neighbor, who was seeing Father at the time, came

over. A fight between the women ensued. Mother claimed that the neighbor was the initial aggressor; however, Mother ended up stabbing the neighbor with a screwdriver. Mother was arrested after the incident, her probation was fully revoked, and she was convicted of simple assault. Mother was incarcerated on August 24, 2016, and remained incarcerated at the time of the trial.

The matter was originally set for trial on December 16, 2016; however, due to Mother's incarceration, the trial had to be rescheduled multiple times. As discussed in more detail, *infra*, following a February 23, 2017 hearing in which trial was continued so that new counsel could be appointed for Mother, DCS filed what it termed an amended petition to terminate Mother's parental rights alleging, in conjunction with the three grounds previously stated, two additional grounds: (1) abandonment by an incarcerated parent for willful and wanton disregard for the welfare of the child and (2) persistent conditions that prevent return of the child. DCS did not request nor receive court permission to file its amended petition. The matter was finally heard on May 18, 2017.

At trial, Mother admitted that she was required to take several actions in the permanency plans, including visiting the child, completing parenting classes, and completing an alcohol and drug assessment. Mother testified that she participated in the in-home visitation with her child and domestic violence counseling provided by DCS until November 2015, when the in-home services stopped. Mother also stated that she had a psychological evaluation and attended some therapy sessions.[4] Mother additionally stated that, despite being hospitalized for a suicidal ideation, she did not need medicine and was not taking any medicine. Mother further testified that she completed anger management and a drug abuse program; these efforts, however, took place following the filing of the initial termination petition, while Mother was incarcerated. Lastly, Mother asserted that she called the Foster Family as often as she could to talk to the child and request visitation; however, Mother claimed that the Foster Family would not allow her to visit the child without contacting DCS first.

Mother's family service worker, Jennifer Williams, testified, however, that despite mailing both permanency plans to Mother, she generally failed to complete the requirements of both plans. For example, although Mother completed a functional parenting assessment, Mother failed to complete the recommendations of the assessment by declining to take all prescribed medications, which was also a separate requirement of the permanency plans. Ms. Williams agreed, however, that Mother did initially participate in some mental health treatment, but stated that Mother did not release her records to DCS from the treatment, preventing DCS from evaluating Mother's progress. Ms. Williams also testified that Mother failed to maintain contact with DCS, failed to

---

[4] It appears that this "psychological evaluation" refers to the functional parenting assessment required by the permanency plan.

- 4 -

contact DCS to set up visitation, failed to show proof of drug treatment or largely participate in random drug screenings, and continued to engage in domestic violence.

At the time of the trial, the child had lived with Foster Mother for approximately two years, and she intended to adopt him as a single parent. Unfortunately, in fall 2016, Foster Family also experienced a domestic incident. Foster Father strangled Foster Mother in November, 2016 while the child was present. Foster Mother, however, obtained an order of protection for her and the child against Foster Father, and Foster Father has not seen the child since the incident. Foster Mother does not plan on Foster Father being part of the adoption. Foster Mother notified DCS the day after the incident occurred, and DCS had a meeting to determine what to do about the child's placement at that time. DCS decided to allow the child to remain in Foster Mother's custody, as long as Foster Father was not there. The Foster Family is currently in the midst of a divorce. The child seems to be thriving while in Foster Mother's care, and both the family services worker and Foster Mother testified that the child has bonded with the Foster Mother while in her custody.

The trial court entered its order on December 6, 2017. The order stated that DCS introduced clear and convincing evidence to terminate Mother's rights on the grounds of (1) abandonment by willful failure to visit; (2) abandonment by an incarcerated parent for the wanton disregard of the welfare of the child; (3) abandonment by the failure to provide a suitable home; and (4) persistence of conditions. The trial court additionally found that it was in the child's best interest to terminate Mother's rights. Mother timely appealed.

ISSUES

Mother raised six issues on appeal, which we have taken and slightly restated from her brief:

1. Whether the Department of Children's Services proved abandonment by failure to visit by clear and convincing evidence?
2. Whether the Department of Children's Services proved by clear and convincing evidence that the Mother committed wanton disregard for her child prior to her incarceration?
3. Whether the Department of Children's Services proved by clear and convincing evidence that the Mother failed to provide a suitable home for the child within the first four (4) months of removal from the Mother's home?
4. Whether the Department of Children's Services proved by clear and convincing evidence that the Mother substantially failed to comply with the permanency plans?

5. Whether the Department of Children's Services proved by clear and convincing evidence that the conditions which originally caused the child to be removed from the Mother's custody continue to persist?

6. Whether the Department of Children's Services proved by clear and convincing evidence that termination of the Mother's parental rights is in the best interest of the child?

In its brief, DCS states that it cannot defend the grounds of abandonment by failure to establish a suitable home or persistence of conditions, as DCS concedes that the evidence was insufficient to support these grounds. As such, we reverse as to those grounds and will only consider the other grounds as found by the trial court in this appeal.

STANDARD OF REVIEW

The Tennessee Supreme Court has explained that

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "situations in which that states interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013), *perm app. denied* (Tenn. Mar. 5, 2014) (citations omitted). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W at 524.

ANALYSIS

Grounds for Termination

*Abandonment Generally*

Abandonment is a statutory ground for the termination of parental rights in Tennessee. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in pertinent part, as

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(i) & (iv). In this case, DCS alleges abandonment by the willful failure to visit, pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i), against Mother. DCS also alleges abandonment by an incarcerated parent for the willful and wanton disregard for the child's welfare, pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv), which applies to a parent that was incarcerated at or near the time of the filling of the petition.

*Abandonment by Willful Failure to Visit*

We begin our analysis with willful failure to visit. As previously noted, to prevail under this definition of abandonment, the petitioning party must prove that "the parent . . . willfully failed to visit" in the four months preceding the filing of the termination petition. Tenn. Code Ann. § 36-1-102(a)(i). For purposes of this section "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(E). In turn, token visitation refers to that "visitation, [which,] under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(C).

A central inquiry regarding abandonment by failure to visit is whether the abandonment was willful. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i); *see also **In re***

*Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005) ("The concept of "willfulness" is at the core of the statutory definition of abandonment.") . This Court has explained the concept of willfulness in prior cases:

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty[] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]

*In re Addison P.*, No. E2016-02567-COA-R3-PT, 2017 WL 1861781, at *6 (Tenn. Ct. App. May 8, 2017) (quoting *In re Audrey*, 182 S.W.3d at 863−64) (internal citations omitted). Additionally, because willfulness is premised on an actor's intent, a trier of fact must often infer intent from circumstantial evidence, since direct proof is generally unavailable. *In re Audrey*, 182 S.W.3d at 864. "'Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law.'" *In re Navada*, 498 S.W.3d at 593 (quoting *In re Adoption of Angela E.*, 182 S.W.3d at 640).

DCS filed the first petition to terminate Mother's rights on May 3, 2015. When a court calculates the relevant four-month period, the last relevant day is the day preceding the filing of the termination petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014). Thus, the relevant four-month period in this case is January 2, 2015, to May 2, 2015. Mother conceded that she failed to visit her child at any time during the relevant four-month period.[5]

---

[5] Mother contends that she saw the child at least one time following the filing of the original petition, in June 2016 at a doctor's appointment. The statute at issue makes clear, however, that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]" Tenn. Code Ann. § 36-1-102(F).

Mother asserts, however, that her failure to visit was not willful because she was refused visitation by Foster Mother.[6] As mentioned above, another person's conduct does not excuse a parent's obligation to visit his or her child unless that conduct "actually prevents the person with the obligation from performing his or her duty[] or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]" *In re Audrey S.*, 182 S.W.3d at 863–64. As such, Tennessee courts have stated that

> [c]onduct that amounts to a significant restraint or interference with a parent's efforts to support or develop a relationship with a child includes (1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child.

*In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018 WL 2261187, at *4 (Tenn. Ct. App. May 17, 2018) (quoting *In re S.M.*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004) (citing *In re S.A.B.*, 735 So.2d 523, 524 (Fla. Dist. Ct. App. 1999)).

Here, Mother argues that her failure to visit the child was not willful because she "tried to call and visit with the child many time during the four months prior to filing the petition[;]" however, each time she would call, Foster Mother "would tell [M]other that [she] must call the Department in order to set up this visitation." Mother further argues that the family services worker at DCS never returned Mother's phone calls attempting to set up visitation. Thus, in essence, it is our view that Mother is arguing that Foster Mother and DCS either actually prevented her from seeing her child and/or significantly restrained Mother's efforts to develop a relationship with her child. In contrast, DCS argues that Mother never attempted to contact the family services worker or anyone at DCS to arrange visitation.

With regard to DCS's allegation that Mother willfully failed to visit her child, the trial court found as follows:

> Mother did call the child and [Foster Mother] to check on him on a frequent and regular basis between January and May 2016. At that time,

---

[6] At trial, Mother's testimony regarding her visiting her child during the relevant period is as follows:

> [Mother's Attorney]: Now, between January of 2016 and May of 2016, were you able to visit with [the child]?
> [Mother]: No.
> Q. Why not?
> A. [Foster Mother] and them, they wouldn't let me visit him.

the Department suggested that since therapeutic services were no longer being provided, visits needed to be supervised and arranged through the FSW [, i.e., the family services worker,] for purposes of documentation. Each time Mother called to request a visit, [Foster Mother] referred her to the FSW, Ms. Williams, to arrange the visit. Mother never contacted Ms. Williams, so the visits never occurred. As a result, Mother has not seen Chase since June of 2016.

***

The [c]ourt has taken into consideration the fact that Mother did visit with [her child] initially and is mindful of defense counsel's argument that she was precluded from visiting by the [F]oster [M]other; however, the [c]ourt finds that she was given instructions time and time again to call the FSW. She had the further ability to come to court and ask for or enforce visitation. Mother has been through this process before and understands the system but has failed to avail herself of the services offered by the Department or the remedies available to her through the [c]ourt. The [c]ourt further notes that even though the Department was excused from reasonable efforts, it is apparent that its representatives were still ready and willing to offer services had Mother shown the slightest inclination to comply. . . . In regards to visitation, the [c]ourt finds that Mother could have exercised her visits prior to her incarceration and knew how to do so but took no action. Therefore, her failure to visit was willful. She simply did not want to deal with the Department.

When the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." **In re Navada N.**, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing **McCaleb v. Saturn Corp.**, 910 S.W.2d 412, 415 (Tenn. 1995); **Whitaker v. Whitaker**, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." **In re Christopher J.**, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing **Whitaker**, 957 S.W.2d at 837).

Although the trial court did not explicitly find that Mother lacked credibility, the trial court's "findings on credibility and weight of the evidence may be inferred from the manner in which the court resolves the conflicts in the testimony and decides the case." **Interstate Mechanical Contractors, Inc.**, 229 S.W.3d 674, 678 (Tenn. 2007) (citing **Rhodes v. Capital City Ins. Co.**, 154 S.W.3d 43, 46 (Tenn. 2004)). Here, the trial court resolved the issue in favor of DCS, finding that Mother knew that she was required to

contact DCS to obtain visitation,[7] but refused to contact DCS to set up the visits. Given that Mother testified to the contrary regarding her efforts to contact DCS, the trial court's resolution of this issue clearly depends on its assessment of the witnesses' relative credibility; in short, the trial court implicitly found the testimony offered by DCS to be more credible than Mother's testimony on this issue and nothing in the record supports overturning the trial court's credibility finding. Because Mother did not avail herself of the avenue presented to her of obtaining visitation, we conclude that the evidence does not preponderate against the trial court's finding that Foster Mother's refusal to set up visitation without DCS intervention did not "actually prevent" Mother from visiting her child nor did Foster Mother's actions "amount to a significant restraint of or interference" with Mother's efforts to develop a relationship with the child.  Accordingly, Mother had no justification in not visiting her child during the relevant period, and Foster Mother's actions did not excuse Mother of her obligation to do so.  Because the evidence is clear and convincing that Mother knew of her obligation to visit the child, yet willfully failed to visit the child in the four months prior to the filing of the petition without justifiable excuse, we affirm the trial court's determination that Mother willfully failed to visit her child during the relevant period.

### Abandonment by an Incarcerated Parent for Willful and Wanton Disregard of the Child's Welfare

According to Tennessee Code Annotated section 36-1-102(1)(A)(iv), abandonment may also occur when

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding . . . [and] the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).  Here, Mother became incarcerated after the filing of the initial petition and continued to be incarcerated through trial.  Due to Mother's incarceration, DCS filed what it termed an "amended" termination petition, ostensibly pursuant to Tennessee Rule of Civil Procedure 15.01, on March 9, 2017; the "amended" petition added the grounds of persistent conditions and abandonment by wanton disregard for the child's welfare against Mother. *See generally* Tenn. R. Civ. P. 15.01 (governing amendments to pleadings).[8]

---

[7] The trial court specifically found that Mother knew of her obligation to contact DCS because she was repeatedly informed of the requirement by Foster Mother and that Mother had previously dealt with DCS with regard to her other children.

[8] Specifically, Rule 15.01 provides, in relevant part,

We have previously noted that, as a threshold matter, the ground of wanton disregard is only applicable where the parent was incarcerated during all or part of the four months immediately preceding the filing of the petition. *See, e.g., **In re Jason S.**,* No. M2016-00226-COA-R3-PT, 2016 WL 5385854, at *6 (Tenn. Ct. App. Sept. 23, 2016) (quoting Tenn. Code Ann. 36-1-102(a)(iv)) ("To establish this ground for termination, DCS must prove '[a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding[.]'"). Thus, we must first determine which four month period is applicable here—the period prior to the filing of the initial petition or the one prior to the filing of the supplemental petition. If the four months prior to the initial petition is the proper period, this ground is simply not applicable in this case. If, however, we look to the four months prior to the filing of the "amended" petition, Mother's incarceration on the date of the filing of that petition renders this ground applicable.

As an initial matter, we note that the Tennessee Rules of Civil Procedure contain a specific rule that governs relation back of "amendments." According to Rule 15.03 of the Tennessee Rules of Civil Procedure, "[w]henever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Tenn. R. Civ. P. 15.03. Relying on this rule, this Court has previously held that where an "amendment" to a termination petition did not constitute a separate and distinct petition, the proper four month period to consider was the four months preceding the filing of the original petition, not the amendment. *See **In re J.G.H., Jr.**,* No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *13 (Tenn. Ct. App. Aug. 17, 2009) (citing **In re S.R.M.**, No. E2008-01359-COA-R3-PT, 2009 WL 837715 at *15 (Tenn. Ct. App. Mar. 27, 2009)).

The same is not true in this case, however, due to the nature of the purported "amended" petition lodged by DCS. Rather than merely include additional factual averments concerning the grounds previously alleged or address deficiencies related to procedural rules applicable in termination proceedings, the "amended" petition in this case sets forth an entirely new ground based upon events that occurred following the filing of the initial petition. As such, our review reveals that DCS's attempt to raise the ground of abandonment by wanton disregard was not governed by Rule 15.01, regarding amendment, but by Rule 15.04, regarding supplemental pleadings.

---

A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been set for trial, the party may so amend it at any time within 15 days after it is served. Otherwise a party may amend the party's pleadings only by written consent of the adverse party or by leave of court; and leave shall be freely given when justice so requires.

- 13 -

Rule 15.04 provides that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." *Id.* Because DCS is relying on an event that occurred after the filing of the original termination petition to support this ground, i.e. Mother's incarceration, it is this Court's view that DCS's "amended" petition should be considered a supplemental pleading.

After determining that DCS's "amended" petition should be considered a supplemental petition, our analysis moves on to whether the new claims raised in the supplemental petition relate back to the date the initial petition was filed by DCS under Rule 15.03. Few Tennessee cases have analyzed this issue. However, because Rule 15.04 is substantially similar to the federal version of the rule, we may look to persuasive federal authority to resolve this issue. *See Bowers v. Estate of Mounger*, 542 S.W.3d 470, 481 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Nov. 16, 2017) (noting that federal law is persuasive in interpreting Rule 15.04). According to a treatise on supplemental pleadings filed in federal courts,

> The relation-back provision of the rule by its terms, relates only to amended pleadings, and the courts have not agreed as to whether a supplemental pleading relates back to the date of the original pleading. Although some courts have held that the doctrine of relation back does not apply to supplemental pleadings, the prevailing view is that a supplemental pleading under the rule may relate back to the date of the original pleading, whether under the provision relating to the relation back of amendments or otherwise. So long as the test for relation back is met, a supplemental pleading should ordinarily be given the same relation back effect as an amended pleading. Thus, a supplemental pleading should ordinarily be given the same relation back effect as an amended pleading, when the supplemental pleading arises out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. Generally, supplemental pleadings are deemed to relate back to the date of the original pleading if the original complaint put the defendants on notice of the continuing nature of the violation alleged.

61A Am. Jur. 2d *Pleading* § 678 (footnotes omitted). In Tennessee, relation back applies where "the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]" Tenn. R. Civ. P. 15.03. Rule 15.03 therefore does not apply in this case where the condition precedent to the ground of wanton disregard alleged in DCS's supplemental petition did not exist at the time of the filing of the initial petition. The supplemental petition is therefore "separate and distinct" from the initial petition for purposes of

relation back. ***In re S.R.M.***, 2009 WL 837715 at *15. As such, we conclude that DCS's supplemental petition alleging the ground of abandonment by wanton disregard does not relate back to the filing of the initial petition. Considering the four months prior to the filing of the supplemental petition, the evidence is undisputed that Mother was incarcerated for all or a portion of this period. This ground is therefore applicable.

Before we proceed to discuss the evidence presented to support this ground, we must first discuss a procedural deficiency with regard to the filing of the supplemental petition in this case. While under Rule 15.01, a party may **amend** their pleadings once as a matter of course at any time before a responsive pleading is filed, Rule 15.04 clearly requires that the party seeking to file a supplemental pleading obtain leave of court. *See generally* Tenn. R. Civ. P. 15.01 & 15.04. As a treatise on this issue has explained,

> Rule 15.04 does not specifically provide for any form of supplemental pleading to be filed without leave of court and, technically, a party should not be able to use the procedure provided in Rule15.01 to file an amended pleading that is in fact a supplemental pleading. In other words, if the pleading actually sets forth matters that have occurred since the filing of the original pleading, a party should not be able to supplement without leave of court by simply labeling the document as an amended pleading.

Robert Banks Jr. & June F. Entman, *Tennessee Civil Procedure* § 5-7(n) (4th ed. 2015). DCS, however, filed no written motion to supplement its pleadings as required by Rule 15.04.

Although no written motion or order is included in the record on this issue, we note that an amendment was discussed at the February 23, 2017 hearing. At that hearing, after a continuance of the trial was granted to appoint a new attorney for Mother, DCS requested to "amend [their initial] petition to allege another ground of persistence of conditions that [they] did not allege the first time[,]" and the trial court orally granted that amendment. *But cf.* ***In re Adoption of E.N.R.***, 42 S.W.3d 26, 31 (Tenn. 2001) ("[A] court speaks through its order, not through the transcript."). The ground of wanton disregard was not mentioned by DCS at this hearing, and no oral or written ruling is included in the record in which DCS was granted leave to file a supplemental pleading alleging this specific ground. [9] Thus, by filing this supplemental pleading without first obtaining leave of court to do so, DCS violated the clear mandate of Rule 15.04 as to the additional ground of abandonment by wanton disregard.

---

[9] In ruling on the oral motion, the trial court specifically asked if an answer had been filed before ruling on DCS's request to file an additional pleading. Thus, it appears that the trial court framed the issue as an amended pleading under Rule 15.01, in which leave would not have been required, rather than a supplemental pleading under Rule 15.04. *See generally* Tenn. R. Civ. P. 15.01. In any event, the ground of abandonment by wanton disregard was never discussed at this hearing.

- 15 -

DCS's violation of Rule 15.04 notwithstanding, we note that "a ground for termination not included in the petition properly can be found if the ground was tried by implied consent." *In re Eimilie A.M.*, No. E2013-00742-COA-R3-PT, 2013 WL 6844096, at * (Tenn. Ct. App. Dec. 26, 2013) (citing *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2013 WL 500829, at *4 n.5 (Tenn. Ct. App. Feb. 8, 2013)); *see also* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *see also* **Sneed v. Bd. of Prof'l Responsibility of Supreme Court**, 301 S.W.3d 603, 613 (Tenn. 2010) (allowing consideration of a supplemental pleading filed without leave of court where the party opposing the supplemental pleading was given sufficient notice and could not show prejudice). Trial by implied consent generally only applies, however, "when evidence claimed to be supporting an issue not raised in the pleadings is also relevant to an issue that is actually raised in the pleadings." *In re S.J.M.*, No. M2009-01080-COA-R3-PT, 2009 WL 4039430, at *3 (Tenn. Ct. App. Nov. 20, 2009). Here, the evidence concerning the ground of abandonment by wanton disregard generally involves the same evidence used to support the properly pleaded ground of substantial noncompliance with permanency plans. Despite this fact, we conclude that Mother was provided sufficient notice in this case.

Implied consent "'seems to depend on whether the parties recognized that an issue not presented by the pleadings entered the case at trial.'" *In re S.J.M.*, 2009 WL 4039430, at *3 (quoting **Zack Cheek Builders, Inc. v. McLeod**, 597 S.W.2d 888, 891 (Tenn. 1980) (citation omitted)). Thus, a party is deemed to have given implied consent at trial when they "'knew or should reasonably have known of the evidence relating to the new issue, did not object to this evidence, and was not prejudiced thereby.'" *Id.* (quoting **Zack Cheek Builders, Inc.**, 597 S.W.2d at 890).

In its supplemental pleading, filed on March 8, 2017, approximately two months before trial, DCS included a section entitled "Abandonment by Incarcerated Parent" which included the statement "Mother engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of the child." The supplemental petition also included specific evidence of Mother's alleged actions of wanton disregard including the specific dates of Mother's incarceration, Mother's arrest and conviction for aggravated assault in 2015, and willful violation of her probation in 2016. Additionally, at trial on May 18, 2017, during opening statements, counsel for DCS stated

> [W]e will go forward on . . . [the ground of] abandonment by an incarcerated parent. The proof is going to show in that regard that [Mother] was in jail or was – I'm sorry, was convicted of –what was her charge, aggravated assault against the child's father, and that while this TPR petition was pending, and she knew she violated her probation and, again, made herself unavailable to parent [the Child] with another ag[gravated] assault charge.

- 16 -

Here, Mother was clearly on notice of DCS's intention to rely on the ground of abandonment by wanton disregard through DCS's filing of the supplemental petition and opening statements in the termination hearing. *See id.* (noting that the issue was not tried by consent, in part, because the ground was not argued to the court). Despite this notice, Mother simply did not object to the consideration of this ground. Likewise, although the trial court found clear and convincing evidence of wanton disregard, Mother does not argue on appeal that the consideration of this ground was improper due to DCS's failure to comply with Rule 15.04. *See* Tenn. R. App. P. 13(b) (noting that review generally only extends to the issues presented for review); *see also* **Skouteris v. Bd. of Prof. Resp. of Supreme Court of Tenn.**, 430 S.W.3d 359, 369 (Tenn. 2014) (noting that litigant waived any error regarding the filing of a supplemental petition where the litigant did not object); *cf., **In re S.J.M.**,* 2009 WL 4039430, at *2 (noting that this issue of whether the ground was tried by implied consent was raised both in the trial court via a motion to alter or amend and explicitly as an issue on appeal). As such, we must conclude that this ground has been tried by consent and that Mother has otherwise waived any consideration of DCS's failure to comply with Rule 15.04 by failing to raise this issue on appeal.

Having concluded that DCS's allegation of wanton disregard for the welfare of the child is proper, we must now determine whether DCS provided clear and convincing evidence to support this ground. "'[I]ncarceration alone [is not] a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found [to have committed] abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child.'" **In re Aaralyn O.**, W2017-01411-COA-R3-PT, 2018 WL 468246, at *7 (Tenn. Ct. App. Jan. 18, 2018) (quoting **In re Audrey S.**, 182 S.W.3d at 866)). Although "incarceration alone is not an infallible predictor of parental unfitness[,]" it is a "strong indicator that there may be problems in the home that threaten the welfare of the child." **In re Aaralyn O.**, 2018 WL 468246, at *7 (quoting **In re Audrey S.**, 182 S.W.3d at 866)). Therefore, incarceration is simply a "triggering mechanism" that allows the court to analyze whether "the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." **In re Audrey S.**, 182 S.W.3d at 866. Tennessee courts have repeatedly held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867–68. The court may additionally consider behavior that occurred before the four months immediately preceding incarceration that displayed wanton disregard for the child. *See id.* at 871. *But see **In re E.C.**,* No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *12 (Tenn. Ct. App. June 6, 2017) (citing **In re Anthony R.**, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015)) (noting that the parent must know of the child's birth or existence in utero to exhibit a wanton disregard for the child's welfare).

With respect to this ground, the trial court found that

> Mother has been incarcerated several different times during this custody episode. On the day of trial, Mother was incarcerated with an expected release date of October 2017.
>
> Mother was arrested and incarcerated in November 2015 for aggravated assault against Mr. Martin. She allegedly stabbed him during an argument over feeding [the child]. On May 4, 2015, she pled guilty to Aggravated Assault and was sentenced to three (3) years and placed on supervised probation.
>
> Mother was arrested again in August of 2016 for assault and violation of probation, resulting in her current incarceration.
>
> ***
>
> Regarding the ground of abandonment by an incarcerated parent, the [c]ourt finds the Department has proven that Mother had a wanton disregard for the welfare of her child. She was incarcerated when this case began and is incarcerated again today. She clearly knew the conditions of her probation, but got caught up in the continuing drama with [the child's] father and that resulted in her going back to jail.

Mother, however, argues that the trial court's analysis in its order "does not meet the burden of proof necessary to prove wanton disregard." We respectfully disagree.

In this case, at least three of the criteria often considered sufficient for a finding of willful and wanton disregard were present. As previously discussed, criminal activity, repeated incarcerations, and probation violations, both alone and in combination with other factors, may support this ground. *See In re Audrey S.*, 182 S.W.3d at 868. During this child's life, Mother was convicted of two violent crimes and a probation violation, resulting in her incarceration at the time of trial and her removal from the child's life. Mother chose to engage in this behavior despite the fact that she was well aware of the consequences of her actions; indeed, her prior children had been removed from her home due to, *inter alia*, issues of domestic violence. Moreover, as late as March 2015, Mother chose to remain in a relationship with Father, with whom she had a well-documented history of domestic violence.[10] Only after a physical altercation resulted in both Mother and Father being arrested did Mother testify that she terminated this relationship.

---

[10] For example, from 2012 to August 2015, Mother filed fourteen police reports against Father.

Mother's issues with violence, however, did not terminate with the cessation of this relationship, as Mother was soon found to have committed another assault in August 2016. Based upon these facts, we must conclude that Mother's continued behavior following the birth of the child shows that she has exhibited a wanton disregard for the child's welfare. Thus, DCS has proven by clear and convincing evidence that Mother demonstrated a wanton disregard for the child's well-being. The trial court's determination on this ground is affirmed.

*Substantial Noncompliance with the Permanency Plans*

Next, we will consider the trial court's finding that Mother substantially failed to comply with the permanency plans. Tennessee Code Annotated section 36-1-113(g)(2) states that a court may terminate a parent's rights if there is clear and convincing evidence that there is "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" Tenn. Code Ann. § 36-1-113(g)(2). Section 37-2-403 states, in pertinent part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

Tenn. Code Ann. § 37-2-403(a)(1)(C). Thus, "to succeed under the statute, DCS must 'demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place.'" *In re Aaralyn O.*, 2018 WL 468246, at *9 (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted)). conclusion

In this case, DCS prepared two permanency plans. The first permanency plan was created on August 27, 2015, and ratified on September 29, 2015. Pursuant to the plan, Mother was to: (1) continue with mental health services and follow all recommendations; (2) remain compliant with all medications; (3) complete an Alcohol and Drug assessment and participate in random drug screens; (4) complete a functional parent assessment with a mental health component and follow all recommendations; (5) maintain consistency on scheduled visits; (6) maintain compliance with therapeutic visitation; (7) cooperate with DCS and service providers; (8) obtain and maintain a legal source of income and housing; (9) attend and complete all future criminal proceedings; (10) complete all orders and restrictions entered by criminal court; and (11) avoid further criminal activity. Additionally, in this plan, DCS was excused from reasonable efforts. The initial

permanency plan was revised in July 2016. The July 2016 revision contained essentially the same responsibilities that were contained in the initial plan, but added that Mother was to demonstrate a period of at least one year of no domestic disputes.

As an initial matter, the trial court found that the requirements on both plans were reasonably related to the reasons that brought the child into foster care. The child was removed from Mother's home as a result of Mother's on-going domestic violence issues, her arrest stemming from those domestic violence issues, and recurring substance abuse issues. Clearly, the requirements of the plans are directly related to these issues.

Next, DCS must show that Mother's noncompliance was "substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d 539, 548–49 (Tenn. 2002)). Thus, "[t]rivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.*

In regard to this ground, the trial court found that

[S]ubstantial noncompliance with the permanency plan ha[s] been proven by clear and convincing evidence. The Department did more toward reunification than Mother did, despite being excused from reasonable efforts. The requirements on both plans were reasonably related to the reasons that brought [the child] into foster care, yet Mother has done next to nothing on the plans. The only things she did do were to submit to the psychological evaluation which the Department provided immediately after [the child] came into state's custody and one drug screen. In those early months, it appears that she was not focused on getting [the child] back. She denied the need for domestic violence counseling and either refused to avail herself of recommended mental health services or refused to provide the Department with proof of her compliance. She did not make herself available for random drug screens. The rest of her minimal efforts were during this last incarceration when the TPR petition had already been filed.

We agree with the trial court's findings. After a review of the record, we agree that Mother did complete some requirements in the permanency plan. Mother completed the functional parenting assessment provided by DCS, took and passed one drug screen, participated in some mental health treatment, and completed some sessions of domestic violence counseling in 2015. Mother, however, failed to (1) fully comply with the recommendations of the parenting assessment, (2) maintain contact with DCS, (3) submit proof of drug treatment, other than passing one drug screen, (4) release her mental health records to DCS, (5) take her prescribed medications, (6) refrain from criminal activity, or (7) demonstrate a period of one year with no domestic disputes, as Mother was arrested

and found guilty for domestic violence in August 2016. Accordingly, we agree with the trial court's statement that Mother did "next to nothing" on the steps in the permanency plan in 2015 by participating in some visits with the child, attending some domestic violence classes, and undergoing a psychological evaluation, all of which were provided by DCS. With regard to Mother's compliance in 2016, however, we conclude that the trial court's assessment was actually overly generous; during this time, it appears that Mother made no effort to complete the requirements of the permanency plan until after she was incarcerated.

Indeed, Mother appears to concede that she substantially failed to comply with the permanency plans contained in the record. Rather, Mother argues that her substantial noncompliance is excused because the permanency plans entered in her case are too confusing, similar to those used in *In re Navada N.*, 498 S.W.3d 579, 603–05 (Tenn. Ct. App. 2016). We agree that "[i]f the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities." *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012). We do not agree, however, that any purported confusion engendered by the plans in this case rises to the level of confusion created in *In re Navada*.

In *In re Navada*, DCS implemented five different permanency plans, each totaling approximately thirty pages in length. *In re Navada*, 498 S.W. 3d at 604. As we explained,

> The tasks as outlined in the permanency plans were exceptionally difficult for this Court to discern. The record on appeal includes five separate plans, each consisting of approximately thirty pages. Our confusion is heightened by DCS's failure to include a clear statement of responsibilities, coupled with the myriad, varied plans put in place over the years in this case.

*Id.* at 604–05 (footnotes omitted). Furthermore, aside from the quantity of plans given to parents and the length of each of the multiple plans, the actual responsibilities laid out for the parents' completion were next to impossible for the parents to actually complete. *Id.* at 605. For instance, one of DCS's requirements that parents were required to complete in the permanency plan was for the child to "learn effective communication skills[,]" although the child was not in either of the parent's custody when this action step was set in place. *Id.* at 605 n.17. Further, the Court noted that DCS's requirement that the child "learn ways to find his self-identity" was too subjective to determine whether completion had occurred. *Id.*

Respectfully, we disagree with Mother's assertion that the permanency plans in this case rise to the level of deficiency present in *In re Navada.* We note that the first

permanency plan at issue in this case includes a single-page checklist clearly and concisely stating Mother's responsibilities under the plan. This document clearly meets the "better practice" outlined in *In re Navada*: "one document with all of the parent's responsibilities[.]" *Id.* at 605 n.18. While the second permanency plan unfortunately does not include a similar checklist, we note that both plans also outline Mother's responsibilities under the heading "Statement of Responsibilities," which included "Action Steps" that detailed tasks Mother was required to complete. As such, DCS provided more than one form of explicit responsibilities for Mother to complete in order to regain custody of her child. Further, this Court cannot overlook the fact that Mother has had a long history with DCS and has been through this process more than once with previous children. As such, we agree with the trial court's sentiment that Mother's claims that she was confused by the permanency plans were "disingenuous [because] Mother clearly has experience with permanency plans and court actions based upon her parental rights having been terminated to three other children." Thus, this Court is not persuaded by Mother's argument regarding the clarity and requirements of the permanency plans.

Mother also argues that "the record is devoid of evidence" that she was notified of the requirements under the amended permanency plan.[11] Respectfully, we disagree. Here, Mother's family service worker testified that she mailed both plans to Mother. The trial court specifically found that "[Mother] was mailed a copy of each of the permanency plans with the Criteria & Procedure for Termination of Parental Rights attached to them." As mentioned *supra*, if the "resolution of an issue in a case depends upon the truthfulness of witnesses[,]" as it does here, "the trial judge . . . is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d at 591 (citations omitted). Again, the trial judge clearly credits the family services worker's testimony that she mailed both permanency plans to Mother. *See Interstate Mechanical Contractors, Inc.*, 229 S.W.3d at 678 ("[F]indings on credibility and weight of the evidence may be inferred from the manner in which the court resolves the conflicts in the testimony and decides the case.") (citing *Rhodes*, 154 S.W.3d at 46)).

Further, even assuming, *arguendo*, that Mother did not receive notice of the amended permanency plan, the only substantive change between the first and second plans was the additional requirement that Mother was to refrain from domestic disputes for one year. It is our view that Mother still would have been substantially noncompliant with the plans even if we were to remove the additional domestic dispute component because Mother only minimally complied with the other requirements of the plan in 2015, and made no attempt to comply with them in 2016. As such, Mother's argument is unavailing. We therefore affirm the trial court's decision that Mother was substantially noncompliant with the permanency plans.

---

[11] Mother does not appear to dispute that she was properly notified of the first permanency plan.

<u>Best Interests</u>

Because grounds exist to terminate Mother's parental rights, we will proceed to analyze whether it is in the child's best interest to terminate Mother's parental rights. When at least one ground for termination has been established, the court must then consider whether termination is in the best interest of the child. ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest. ***In re Audrey S***., 182 S.W.3d at 877. Tennessee's parental termination statutes recognize that not all parental conduct is irredeemable, and that it is possible that terminating that parent's rights may not be in the best interest of the child. ***In re Navada N.***, 498 S.W.3d at 606–07 (citing ***In re Audrey S.***, 182 S.W.3d at 877)). As the Tennessee Supreme Court recently explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." ***In re Kaliyah S.***, 455 S.W.3d at 555 (citing ***In re Audrey S.***, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." ***Id.*** When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. ***Id.*** "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

***In re Gabriella D.***, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors for courts to consider in their determination of whether termination is in a child's best interest. The factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). We further note that, "'this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child.'" *In re Navada N.*, 498 S.W.3d at 607 (quoting *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005)). Therefore, depending on the facts and circumstances surrounding each case, "the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis." *In re Navada N.*, 498 S.W.3d at 607 (citing *In re Audrey S.*, 182 S.W.3d at 877)). However, even if the circumstances of a case result in the trial court "ascribing more weight—even outcome determinative weight—to a particular statutory factor," the court is not relieved from considering all factors and all the proof presented. *In re Gabriella D.*, 531 S.W.3d at 682. Moreover,

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case.

*In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

In this case, the trial court found that the termination of Mother's parental rights was in the best interest of the child. We agree. First, Mother has not made an adjustment in circumstances that would make it safe for the child to return to her home, despite efforts by DCS to help Mother work toward reunification. *See* Tenn. Code Ann. § 36-1-113(i)(1) (involving a lasting adjustment of circumstances to make it safe for the child to return home) & (2) (involving a lasting adjustment following reasonable efforts by DCS). The child was removed from Mother's care due to issues with domestic violence. Mother, however, was incarcerated at the time of trial due to domestic violence incidents, specifically incidents stemming from contact with Father. Further, Mother did not have a stable home for the child at the time of trial, and would not have a stable home until after she completed her time at a halfway house for at least six months. Finally, Mother failed to make an effort to complete most of the requirements of the permanency plans, despite support from DCS. These factors militate in favor of termination.

Next, we previously found that Mother failed to maintain regular visitation with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3) (involving whether the parent has maintained visitation). Initially, Mother visited with the child fairly regularly in the months after he entered DCS custody in August 2015. Once DCS discontinued certain services in November 2015, however, Mother's contact with the child was largely limited to her phone calls to Foster Mother. As previously noted, Mother was well aware that she needed to contact DCS to arrange visitation, but declined to make contact with DCS. Due to Mother's inaction and later criminal activity that resulted in her incarceration, Mother had not seen the child in approximately one year. Mother has also failed to pay any support for the child while he resided with Foster Mother, other than providing the child with some clothing items. *See* Tenn. Code Ann. § 36-1-113(i)(9) (involving whether the parent has paid support). Additionally, due to Mother's failure to maintain visitation during the child's short life, a meaningful relationship has not been established between Mother and the child. *See* Tenn. Code Ann. § 36-1-113(i)(4) (involving whether the parent and child have a meaningful relationship). Instead, because the child has been in the care of Foster Mother since he was about five months old, he has a maternal bond with her. Accordingly, these factors weigh in favor of termination.

We also note that Mother has been arrested for aggravated assault for stabbing Father in the home while the child was present, and has also been arrested for assault for stabbing her neighbor with a screwdriver. As such, Mother has engaged in physical

- 25 -

violence with another adult in the home multiple times, once while the child was present. *See* Tenn. Code Ann. § 36-1-113(i)(6) (involving whether the parent has engaged in physical abuse in the home, both toward the child or toward another adult in the home). In that same vein, Mother has been arrested twice and subsequently violated her probation resulting in incarceration. Thus, Mother's criminal history since the child was born renders her consistently unable to care for the child in a safe manner. *See* Tenn. Code Ann. § 36-1-113(i)(7) (involving whether there is criminal activity in the home). Indeed, because of Mother's decision to engage in physical violence resulting in Mother's incarceration, there is currently no home for the child to return to. *See id.* (involving the physical environment of the parents' home). Mother also has some mental health issues and at trial she testified that she did not need to take her prescribed medication. *See* Tenn. Code Ann. § 36-1-113(i)(8) (involving the parent's mental and emotional status).

Most importantly, a change in caretakers would certainly have a negative effect on the child. *See* Tenn. Code Ann. § 36-1-113(i)(5) (involving the detrimental effect on the child of a change in caretakers). Foster Mother had been the child's caretaker for almost two years at the time of trial. By all accounts, the child was thriving in her care and living a happy and healthy life. Foster Mother also testified that she intended to adopt the child. This Court is cognizant that Foster Mother was subject to a domestic violence incident in November 2016, while she and her husband had custody of the child. Foster Mother, however, promptly informed DCS of the incident and obtained an order of protection against Foster Father for her and the child. As such, DCS determined that the child was safe in Foster Mother's care as long as Foster Father was not there. Additionally, the child has not seen Foster Father since the incident and there are no plans for him to be involved in the child's adoption. Foster Mother is currently in the process of obtaining a divorce from Foster Father. As such, it appears that unlike Mother, Foster Mother has taken every step necessary to ensure that domestic violence is never again present in her home. In light of the steps taken by Foster Mother regarding the well-being and safety of the child, and the bond Foster Mother and the child share, we agree that a change in caretakers would be detrimental to the child. Considering the foregoing, we agree with the trial court's decision that termination of Mother's rights is in the child's best interest.

CONCLUSION

The judgement of the Davidson County Juvenile Court is affirmed in part and reversed in part. The termination of T.L.'s parental rights to the child, Chase L., is affirmed. Costs of this appeal are taxed to T.L., for which execution should issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE